**FILED**
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS

Jul 12, 2022

OFFICE OF THE CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**Joan Doe
PLAINTIFF**                                    )
                                               )
**v.**                                         )          **Civil Case No.** _5:22cv5137-PKH_
                                               )
                                               )
**The Board of Trustees for**                  )
**The University of Arkansas in their**        )
**Official Capacity, University of Arkansas**
**President And CEO Donald Bobbitt,**
**The University of Arkansas School of Law,**
**DEFENDANT(S)**

COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF, DECLARATORY JUDGEMENT
AND OTHER EQUITABLE RELIEF

Plaintiff, J. DOE, petitions this Court and alleges based on information and belief that the Board

of Trustees for the University of Arkansas in Their Official Capacity, and the University of

Arkansas President and CEO Mr. Donald Bobbitt, (hereinafter University Defendants or

Defendants), is legally responsible for the following counts of unlawful conduct:

    a. Count I, violation of Title II of the American's with Disabilities Act, 42.
       U.S.C.A. §§ 12132 et. seq..

    b. Count II, violation of the Family Educational Rights and Privacy Act

    c. Count III, violations of the Due Process Clause of the Fourteenth Amendment of
       the United States Constitution

## II. JURISDICTION AND VENUE

1.     This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States.  This Court has jurisdiction under 42 U.S.C. § 12133 which links to the Civil Rights Act of 1964 and § 794(a)(b) of Title 29 and provides a private right of action to any person aggrieved by any act or failure to act by any recipient of federal assistance or federal provider of such assistance.  This Court has jurisdiction under 42 U.S.C § 12203 which prohibits retaliation and coercion.  The relief requested is authorized by the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201, 2202 and other aforementioned statutes.

2.     Defendants' Eleventh Amendment immunity is waived by 42 U.S.C. 2000d-7, because the claims involve violations of Section 504 of the Rehabilitation Act and Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d].

3.     Sovereign immunity is waived by Arkansas Common Law, specifically held in *Monsanto Co. v. Ark. State Plant Bd.*, 2019 Ark. 194, at 9; *Ark. Game & Fish Comm'n v. Heslep*, 2019 Ark. 226, at 6.  Sovereign immunity is also waived by the *Ex parte Young* holding that the Eleventh Amendment provides no shield for a state official confronted by a claim of deprivation of federal rights or by a claim for injunctive relief.  *Ex parte Young, 209 U.S. 123 (1908)*.

4.     Arkansas common law permits claims against the State that allege illegal and unconstitutional acts and seek declaratory judgment and injunctive relief.  *See Ark. Dept. of Ed., et. al. v. McCoy*, 2021 Ark. 136, at 7, *citing Monsanto Co. v. Ark. State Plant Bd.*, 2019 Ark. 194, at 9, 576 S.W.3d 8, 13.  Federal law creates a duty for Courts to intervene where state laws infringe the rights provided in the United States Constitution and other federal laws and treaties. *McCulloch v. Maryland*, 17 U.S. 316 (1819).

5.    Venue is proper in the Western District of Arkansas under 28 U.S.C.A. § 1391 because Defendant is situated here and because a substantial part of the events and omissions giving rise to the claim occurred in the Western District of Arkansas.  28 U.S.C. § 1391(b).


## III. PARTIES

6.    Plaintiff, Joan Doe, is a third year law student at the University of Arkansas School of Law.  Plaintiff is a resident of Pennsylvania.

7.    Defendant, the Board of Trustees for the University of Arkansas and the CEO and President for the University of Arkansas System, Donald Bobbitt, are the parties to be named in a lawsuit against the "public entity" that is the University of Arkansas, its school of law, and its employees, as directed by this honorable Court.  *ADA, 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104*.  Defendant is therefore subject to title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. § 35.

8.    The Board of Trustees for the University of Arkansas and the CEO and President for the University of Arkansas System have managing authority for the University of Arkansas and its Fayetteville campus which includes the school of law.  Defendants Mr. Donald Bobbitt and the Board members are sued in their official capacity.

9.    The University of Arkansas at Fayetteville is a public institution of post secondary education located in Fayetteville, Arkansas.  The University's Fayetteville campus and its law school are agencies of the state because they function and exist so closely to the government that they could not exist without it.

## IV. FACTS

**Introduction**

10.     Plaintiff is a third year law student at the University of Arkansas School of Law.  Prior to the actions giving rise to this complaint, Plaintiff was in good standing with no misconduct reports.  Plaintiff was suspended from Defendants' law school on Sept. 30, 2021, in violation of the Americans with Disabilities Act's prohibition against conduct that "directly or through contractual or other arrangements, utilize[s] criteria or methods of administration [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  *28 C.F.R. § 35.13(b)(3)(i)*.  For the purpose of this litigation, Plaintiff qualifies for ADA protection under the definition provided in *Bragdon v. Abbot*.  *Id.*, 524 U.S. 624 (1998) (*holding that a person is disabled if she is "regarded as having such an impairment"*).

11.     In or around September of 2021, Defendant ordered Plaintiff to submit to medical treatment, to release the records of that treatment to a third-party, and to release that third-party to communicate the contents of Plaintiff's involuntary medical treatment back to Defendant.  These orders were coercive and Plaintiff's continued access to education was conditioned upon compliance therewith.

12.     When Plaintiff did not comply with Defendant's orders she was suspended without proper notice and without any prior deprivation procedure.  Plaintiff was denied accommodations prior to being suspended—constituting a violation of the ADA's requirement that a public entity shall make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate the modifications would fundamentally alter the nature of the program.  *28 C.F.R. § 35.13(7)*.

13.     The suspension order violated the procedrual due process guarantee of the Fourteenth Amendment because it was issued without proper prior notice and without regard for the legal

requirement that deprivations of liberty must must be implemented in the least restrictive method. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) (*finding that notice reasonably calculated is the requirement of due process*), see also *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (asserting that the Due Process clause forbids arbitrary deprivations of liberty) see also, *Jegley v. Picado*, 349 Ark. 600, 631–32, (2002) (*finding that government action that infringes a fundamental right must be implemented in the least restrictive method*), and see also *Doe v. Purdue Univ.*, 928 F.3d 652, 697 (7th Cir. 2019), citing *Goss v. Lopez*, 419 U.S. 565, at 574 (1975) (*finding that when a right is protected by the Due Process Clause, a state may not withdraw it on grounds of misconduct absent fundamentally fair procedures to determine whether the misconduct has occurred*).

14.     The misconduct charge and suspension letter alleged violations of three conduct statutes:

   a. **Code F38: Failing to comply with orders or directives of University officials, University hearing bodies, University Police or any other law enforcement officers acting in the performance of their duties.**
   b. **Code F31: Harboring or bringing a pet on University premises in violation of University policy.**
   c. **Code F11. Disorderly conduct including, but not limited to the following: engages in fighting or in violent, threatening behavior, makes unreasonable or excessive noise, uses abusive or obscene language or makes obscene gestures, disturbs or disrupts any assembly, classroom or meeting of persons, obstructs vehicular or pedestrian traffic, or creates a hazardous or physically offensive condition.**

15.     Plaintiff received the suspension letter on Sept. 30th via email. The letter alleges that *"on or around Sept. 4, 2021, [Plaintiff] may have been involved in activities that are in violation of the Code of Student Life. Specifically, it has been alleged that you have: failed to comply with directives of the University of Arkansas Law School Faculty/Administrators, brought an unauthorized pet onto UofA facilities, and left pet feces inside of UofA facilities."* The letter

goes on to state that the Director of Student Conduct is responsible for the "safety" of the University's community and is "extremely concerned" about the allegations, thus an interim suspension is ordered. Twenty-six days after the alleged conduct violation, the 'extreme concern' held by the Director of Student Conduct was all the University required to deprive Plaintiff of a protected liberty interest and the procedural due process right to a pre-deprivation proceeding. The suspension letter notwithstanding, the Director of Student Conduct did nothing to assuage her extreme concern in the twenty-six days that passed between the alleged incident and Plaintiff's suspension.

16.     The University's Code of Student Conduct states the following regarding interim suspensions:

> *"An Interim Suspension is implemented when the VCSA or designee has reasonable cause, based on available facts, to believe that a student poses a significant risk of substantial harm to the health, safety, or welfare of others or to property or poses an ongoing threat to the disruption of, or interference with, the normal operations of the University."*

17.     The twenty-six days that passed between the alleged conduct violation incident and the interim suspension, during which Plaintiff attended classes and completed assignments, make implausible and uncredible any argument that Plaintiff presented a "significant risk of substantial harm" or "an ongoing threat to the disruption of" anything.

18.     After receiving notice of the suspension, Plaintiff requested an administrative hearing in which Plaintiff was found responsible for all misconduct allegations. The letter communicating the outcome of the hearing provides the following "rationale": "[t]he student was found responsible for all violations in question based on the information contained in the student's

file." But Plaintiff's file contains nothing that even suggests Plaintiff presented a safety threat to herself or the University community. Plaintiff's file contains nothing that proves Plaintiff's dog was responsible for the feces found in the law school building nor that there was ever any feces actually found in the law school building.

19.     During this time, Plaintiff brought her dog onto campus and into the law school building, including into classes. Plaintiff emailed various professors about brining her dog and received varied responses. Plaintiff complied when asked to remove her dog from university grounds. Plaintiff had seen other students and faculty with their pets in the law school building and on campus.

20.     Other than being asked to remove the dog from the law school building, a request with which Plaintiff complied, Plaintiff experienced no "events" or "incidents" involving the dog.


**Evidentiary Standard**

21.     The University Code of Student Life states that students charged with infractions shall be presumed not responsible until determined otherwise using the preponderance standard of evidence. It follows, then, that there must be evidence making it more likely than not that Plaintiff is responsible for alleged conduct violations before a finding of "responsible" may be assigned.

22.     The standard of proof required for each is as follows:

   **i. Code F38: Failing to comply with orders or directives of University officials, University hearing bodies, University Police or any other law enforcement officers acting in the performance of their duties.**
   This allegation involves Defendant's order of mental health treatment and disclosure of treatment records and thus falls squarely under the ADA. The ADA requires the direct

threat standard to be met before a public entity may take such actions. Thus Defendant must have proof that makes it more likely than not that Plaintiff is a risk to her own safety or that of others before it may order an evaluation as a condition of services. And even then, Defendant must provide reasonable accomodations in the least restrictive manner and the evaluation must be conducted in a manner that complies with the requirements of the ADA. No proof was offered that Plaintiff is a threat to herself or others. No accommodations were offered to allow Plaintiff to continue accessing the right to education already granted.

### ii.    Code F31: Harboring or bringing a pet on University premises in violation of University policy. (See Appendix G).

The preponderance standard of evidence requires proof with a greater than 50.01% certainty that Plaintiff brought a pet onto University premises ***and*** intended to do so in violation of University policy. If intent weren't a factor, the code would be a strict liability rule. And a strict liability rule would punish each person who brings a pet onto campus. Plaintiff had no intent to violate University policy. Nor is there any evidence supporting such an allegation. Once Plaintiff was instructed to cease bringing the dog onto University premises, she did so. More importantly, the presence of a pet does not align with the reasons an interim suspension may be imposed—the dog is not accused of presenting a danger or threat to anyone or anything.

### iii.    Code F11. Disorderly conduct including, but not limited to the following: engages in fighting or in violent, threatening behavior, makes unreasonable or excessive noise, uses abusive or obscene language or makes obscene gestures, disturbs or disrupts any assembly, classroom or meeting of persons, obstructs vehicular or pedestrian traffic, or creates a hazardous or physically offensive condition.

Though never articulated in any document or during any of the proceedings, Plaintiff understands this alleged conduct violation to involve the allegation of dog feces found in the law school building. Then for Plaintiff to be found responsible for this violation, there must be evidence that makes it more likely than not that (1) dog feces was in fact found in the law school building, and (2) that it was Plaintiff's dog's feces found in the law school building. There is no evidence whatsoever of either. There are two emails from an unidentified person stating feces was observed in the law school building on Sept. 25 and Sept. 28.. There are no photos of the feces. Neither email reports seeing Plaintiff or her dog in or around the law school building on the dates the feces was allegedly found. On one of the dates in question, Plaintiff's dog wasn't on the University campus. On the other date in question, Plaintiff's dog was on the University campus only briefly in the morning but not after 8:30am. Thus, an objective assessment of the facts does not support a finding of responsibility.

**Chronology of Events**

23.    On Aug. 30, 2021, Plaintiff reported to three law school professors she would be unprepared for that day's classes and would submit an (ungraded) assignment late because of harassment she experienced off campus. On Sept. 4, 2021, Plaintiff reported to four law school professors acts of abuse, harassment, and violation that happened to her at a number of places, including the law school building's classrooms and campus grounds. Plaintiff submitted multiple subsequent written reports of being harassed on campus property. Plaintiff submitted requests for assistance with finding a safe place to study. Plaintiff made written and verbal requests for an investigation into the source of the harassment.

24.     On Sept. 7, Plaintiff received an email notifying her that Defendant had concerns about its ability to certify her character and fitness to practice law.  The email stated the causes of concern were conversations with professors, inability to prepare for class, and affected academic performance without any specifics articulated.  The email *required* Plaintiff's attendance at a meeting scheduled the next day in direct conflict with one of Plaintiff's classes, and it issued a prohibition on Plaintiff's communication with any faculty members other than *former* Associate Dean Susannah Pollvogt about "being monitored and related activity."  When Plaintiff challenged the prior and content based restraint on her speech, Defendant asserted its stated need to certify Plaintiff's character and fitness for admission or application to the bar.  At no time did Plaintiff seek admission to the bar.

25.     On Sept. 8, Plaintiff was ordered by Defendant via email to contact JLAP "to discuss counseling options."  On Sept. 9, Plaintiff was ordered to "follow the course of action recommended by [JLAP], including but not limited to a series of counseling appointments."

26.     On Sept. 9, Plaintiff advised JLAP did not recommend counseling.

27.     Citing no behavior observations, student or faculty complaints, disruptive events, specific concerns, or other rationale, on Sept. 10, Defendant ordered Plaintiff to contact JLAP by "the end of business Monday, 9/13/2021" and "arrange for a psychiatric evaluation."

28.     A psychiatric evaluation must be provided by a licensed, board certified medical doctor specializing in psychiatry.  Thus, Defendant ordered Plaintiff to receive medical treatment.

29.     On Sept. 27, Plaintiff received an email from Defendant directing her to sign JLAP's release of information.  Plaintiff requested additional time, and Plaintiff offered to provide the

requested information directly to Defendant.  Defendant insisted Plaintiff provide a release of information to JLAP.

30.     The email from Defendant states:

> *"As part of the character and fitness process, we need for Ms. Donaldson [social worker and executive director of JLAP] to review the entire evaluation and provide a recommendation to us.  As always, the authority comes from the requirement that we certify you for character and fitness.  Please provide the consent form to her by the end of the day tomorrow."*

31.     Plaintiff responded on Sept. 27, explaining that she needed more time, wanted to consult her attorney, and asked again for a reasonable time extension, and for the authority that requires submission of personal medical information to JLAP.

32.     By 5:18pm on Sept. 27, Plaintiff was notified that her failure to release her medical records to JLAP meant she was not in compliance with the process.  Plaintiff had no knowledge that "the process," or noncompliance therewith, involved the threat of suspension.

33.     Plaintiff asked again for a reasonable time extension and expressed a willingness and desire to comply.  Defendant was unmoved and advised Plaintiff to complete the release that day (Sept. 28).

34.     Two days later, without discussion, Plaintiff was placed on interim suspension.  Plaintiff was required to obtain police escort to collect her personal belongings from the law school building.

35.     Defendant asserts its faculty policy manual – a manual that is not available to students or to the public – affords it the authority and broad discretion to order mental health services when concerns about student character and fitness arise.

36.     Though Defendant's stated government interest is valid, the manner in which Defendant sought to achieve its interest violated the Americans with Disabilities Act. Courts consistently hold, and the Dept. of Justice reinforces, the appropriate measure of character and fitness for the practice of law is conduct, not status.[1]

37.     Plaintiff exhausted Defendant's hearing and appeal process. Plaintiff remains suspended and subject to arbitrary conduct sanctions. Plaintiff files this complaint seeking declaratory and injunctive relief.


### V. COUNT I, VIOLATION OF TITLE II OF THE AMERICAN'S WITH DISABILITIES ACT'S GENERAL PROHIBITION AGAINST DISCRIMINATION

38.     Defendant violated the Americans with Disabilities Act (ADA) 42. U.S.C.A. §§ 12132 et. seq. and 12134(a), which prohibits discrimination against individuals with disabilities, real or perceived, by public entities. *28 C.F.R. §§ 35.13(b)(3)(i) and 35.130(b)(6)*. Section 12132 et. seq. of the ADA links to Section 504 of the Rehabilitation Act and to the Civil Rights Act of 1964.

39.     The text of the Act prohibits conduct that "directly or through contractual or other arrangements, utilize[s] criteria or methods of administration [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." *28 C.F.R. §*

---

[1] Letter from Jocelyn Samuels to C.J. Bemette J. Johnson et al. 2 (Feb. 5, 2014) [hereinafter DOJ Letter], *available at* http://www.ada.gov/louisiana-bar-lof.pdf.

*35.13(b)(3)(i)*.  A public entity may not "administer a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of discrimination."  *28 C.F.R. § 35.130(b)(6)*.

40.     The American's with Disabilities Act expressly states that:

> *"[a] state shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this Act.  In any action against a State for a violation of this Act, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a state."  28 C.F.R. § 35.178.*

41.     The ADA further provides that the prohibitions of Title II extend and apply to all "services, programs, and activities provided or made available by State and local governments or any of their instrumentalities or agencies regardless of the receipt of Federal financial assistance*.*"  *28 C.F.R. § 35.102.*

42.     The ADA prohibits selection processes that involve stereotypic assumptions not truly indicative of the individual ability of an individual to participate in a given government benefit or service.  *See 28 C.F.R. § 35.130(h).*

**Direct Threat Standard**

43.     The Americans with Disabilities Act requires a finding of a direct threat before a public entity may withhold services to an otherwise eligible recipient.

44.     The relevant section of the Americans with Disabilities Act states:

*"A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision or the service, program, or activity being offered." A.D.A. Title II, Subpart B, § 35.130(b)(8).*

45.     Under the ADA, a person is disabled if she (a) has "a physical or mental impairment that substantially limits one or more major life activities," (b) has "a record of such an impairment," or (c) is "regarded as having such an impairment." *See Bragdon v. Abbott*, 524 U.S. 624 (1998).

46.     Defendant treated Plaintiff as a person regarded as having an impairment. Defendant used its stated concerns for Plaintiff's mental health to screen for disability absent any articulated finding of necessity relative to the provision of education services.

47.     A public entity is not required to "permit an individual to participate in or benefit from the services, programs, or activities of that public entity when that individual poses a direct threat to the health or safety of others." *28 C.F.R. § 35.139(a)*. A "direct threat" is defined by the regulations as "a significant risk to the health or safety of others than cannot be eliminated by a modification of policies, practices or procedures, or by the provision of auxiliary aids or services as provided in § 35.139."[2] When the direct threat standard is met, the public entity may

---

[2] 28 C.F.R. § 35.104, and Cecily Fuhr, Esq., *Causes of Action Under Title II of Americans With Disabilities Act, 42 U.S.C.A. §§ 12132 et seq. and State Statutes for Discrimination in Bar Admission Due to History of Mental or Emotional Disorders*, 54 Causes of Action 2d 1, §14, Oct. 2021 update.

require an individualized assessment of the individual.  *Bragdon v. Abbot*, 524 U.S. 624 (1998).

Public entities evaluating a person who poses a direct threat must ensure the evaluation:

> *"[is] based on an individualized assessment, based on reasonable judgment that relies on current medical evidence or the best available objective evidence, to determine: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk."  ACLU of Indiana v. Individual Members of the Indiana State Bd. of Law Examiners*, No. 1:09-CV-842-TWP-MJD, 2011 WL 4387470, (S.D. Ind. Sept. 20, 2011).

48.     The method for the evaluation varies based on the type of policy or decision challenged. Courts consider how closely the public entity's action relates to the identified direct threat and how accurately the method identifies people who actually pose a direct threat.[3]

49.     The public entity must demonstrate the facts and circumstances created a significant possibility that the direct threat existed and its actions were necessary to mitigate the threat to public safety.

50.     Defendant alleges no facts or circumstances that meet the direct threat standard.  Instead, Defendant used its discretion and authority as a government agency to screen Plaintiff for disabilities and to require her waiver of the fundamental right to privacy as a condition to continued access to education.  When Plaintiff asked for a reasonable accommodation in the

---

[3] *Id. supra Causes of Action*, at §14.

form of an option to provide written documentation under seal which would resolve the stated concern, Defendant declined.

51.     Thus, Defendant failed its duty to provide a reasonable accommodation to resolve the stated concern before resorting to a reduction in services and mandatory individual evaluation. Defendant's conduct alleged herein constitutes discrimination in violation of the ADA, 42 U.S.C. § 12132 and its implementing regulations.


**VIOLATION OF THE ADA'S PROHIBITION OF RETALIATION OR COERCION**

52.     The relevant section of the ADA states: "[n]o private or public entity shall discriminate against any individual because that individual has opposed any act or practice made unlawful by this part, or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the Act or this part." *28 C.F.R. § 35.134.*

53.     Defendant initially ordered Plaintiff to contact JLAP and discuss mental health counseling in response to Plaintiff's emailed report of harassment.  This constitutions discrimination—being treated as or perceived as having a disability— in response to a charge Plaintiff made—that is, the charge of being harassed in the law school building and on the university campus.  When Plaintiff reported to Defendant that JLAP did not recommend counseling and she would not undergo counseling, Defendant then ordered a psychiatric evaluation and demanded Plaintiff sign releases allowing the medical doctor to give the medical record to JLAP and allowing JLAP to give the medical record to the law school.  When Plaintiff challenged the basis for the order, the violation of privacy, and the authority under which the law school acted, Plaintiff was threatened with being deemed noncompliant with "the process."

When Plaintiff did not comply with the law school's demands, Plaintiff was suspended—that is, when Plaintiff opposed Defendant's discriminatory acts made unlawful by the ADA, Plaintiff was suspended. *28 C.F.R. § 35.134(a)*. Defendant's conduct alleged herein constitutes a violation of the ADA's prohibition on retaliation or coercion.

## VI. COUNT II, VIOLATION OF THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT

54. University Defendants violated the Federal Education Right to Privacy Act (FERPA) when they conditioned Plaintiff's continued access to education on compliance with the demand for Plaintiff to release personal medical records to JLAP (Judges and Lawyers Advocacy Program). Defendants further violated FERPA when they demanded Plaintiff provide release for that JLAP to release Plaintiff's medical records to Defendant and when they conditioned Plaintiff's continued access to education upon Plaintiff's compliance with the stated demands.

55. FERPA, the Federal Education Right to Privacy Act, is a federal department of education funding statute enacted in 1974 to serve as a means to withhold funding from schools who do not comply with federal privacy regulations meant to protect student privacy. *Cong. Rec. vol. 120, pt. 30, 1-2, p. 39863, ("It is the hope of the sponsors of this amendment that . . . the protection of [student] privacy be assured")*. The regulations implementing FERPA are contained in Title 34, Part 99 of the Code of Federal Regulations. FERPA provides no private right of action for aggrieved students.

56. But unconstitutional and unlawful practices should not go unaddressed and this Court has authority, no a duty, to intervene and prevent unconstitutional harms, particularly harms against vulnerable students. *Ex parte Young*, 209 U.S. 123 (1908). Where the law provides no meaningful remedy, Courts may intervene. *McCulloch v. Maryland*, 17 U.S. 316 (1819).

Federal courts have jurisdiction and authority to review state conduct under federal laws and provide an interpretation and application of those laws that produce a uniform application throughout the country. *Martin v. Hunter's Lessee*, 14 U.S. 304 (1816).

57.     FERPA functions as an incentive for colleges and universities to conduct their affairs in a manner that protects student privacy. When Plaintiff raised concerns about the absence of protection for her privacy presented by Defendant's demands, Defendant advised that FERPA permits its course of conduct and protects student privacy concerns.


58.     But this misrepresents what FERPA provides for three reasons: (1) the legislative record and text of the FERPA statute expressly prohibit use of a waiver of student privacy as a precondition to enrollment or matriculation or provision of any other service normally offered; (2) Defendant's office of student conduct is currently governed by FERPA, and it uses no advanced privacy protocols when handling student medical records once they are added to the student's education record as demonstrated by the breach of protocol Plaintiff experienced when she received an email from the conduct office containing documents meant for another recipient; and, (3) FERPA provides no private right of action for aggrieved students whose privacy is breached by a covered institution.

59.     The text of the FERPA statute expressly prohibits inclusion of student medical or treatment records in the education record. FERPA's definition of an education record expressly excludes:

> *"[r]ecords on a student who is 18 years of age or older, or is attending an*
> *institution of postsecondary education, that are: made or maintained by a*
> *physician, psychiatrist, psychologist, or other recognized professional or*

*paraprofessional acting in his or her professional capacity or assisting in a*

*paraprofessional capacity; made, maintained or used only in connection with*

*treatment of the student; and disclosed only to individuals providing the*

*treatment." See 34 C.F.R. § 99.3.*

60.    Under FERPA, records that are "only available to professionals and paraprofessionals

providing treatment to the student, or to physicians or other appropriate professionals of the

student's choice," are considered 'treatment records.' And treatment records may not be in the

education record. The clear legislative intent here is to protect student privacy. Defendant

attempted to circumvent FERPA by mandating Plaintiff release her treatment record to the

Social Worker employed by JLAP who would act as the handler of Plaintiff's medical treatment

records. A Social Worker is not a professional or paraprofessional and thus any student

treatment records a Social Worker provides to Defendant do not violate FERPA.

61.    If there is doubt as to whether Congress intended FERPA's exclusion of treatment

records from a student's education, we need only look to the legislative history of the law.

FERPA's legislative intent, specific to the definition and exclusions of 'education record,' is

documented in the Cong. Rec., vol. 120, pt. 30, 1-2, pp. 39705-39888.

62.    The record contains dialog between Senator Mondale and Senator Pell about whether the

statute permits postsecondary institutions to require students to sign waivers of the

confidentiality FERPA affords them as a condition of any service normally provided.


*"[Sen.] Mondale.  Mr. President, I am somewhat concerned as are Senator Williams and*

*Senator Javits about the provision of this amendment that would permit students to waive their*

rights to confidentiality of or access to their records. Under the provisions of this amendment would a postsecondary institution be permitted to require, as a condition of application, acceptance, or any other service normally provided to students at the institution, that a student sign such a waiver?

[Sen.] Pell. There is nothing in the proposed language which would permit an institution to require such a waiver as a precondition of application, or any other service normally provided to students at the institution.

[Sen.] Mondale. Would there be any conditions under which an institution could compel any of its students to sign such a waiver?

[Sen.] Pell. Under the proposed language an institution would be permitted to request such a waiver of applicants or students but would not be permitted to require that the student waive his rights to either the confidentiality of this records, or his access to those records as a precondition to enrollment or matriculation or any other service normally provided to students at the institution under any circumstances." *Cong. Rec., vol. 120, pt. 30, 1-2, pp. 39705-39888, 39864.*

63.     The "proposed language" was unanimously approved as-is.

64.     Defendant's directive that Plaintiff release her medical record to JLAP and that Plaintiff permit JLAP to release said record to Defendant circumvents FERPA's prohibition on comingling student medical records in student education records in contravention of the

legislative intent of the statute.  When Plaintiff declined to waive her rights under FERPA, and

other state and federal laws protecting an individual's fundamental right to privacy in medical

records, Defendant suspended her.

65.     Defendant's conduct alleged herein constitutes a pattern and practice of violation of

FERPA.  There need not be a private right of action in order for this Court to intervene and

cease unlawful conduct.


### VII. COUNT III, VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION

66.     Defendant's conduct constitutes the following violations of the due process clause:

> **(a) Procedural Due Process Violation, Inadequate Process Led to Erroneous Outcome and Irreparably Harmed Plaintiff's Standing and Reputation, and Deprived the Freedom to Pursue Plaintiff's Occupation of Choice**

> **(b) Procedural Due Process Violation, Failure to Provide Impartial Adjudicator and a Meaningful Hearing**

> **(c) Procedural and Substantive Due Process Violation, Inadequate Notice Caused Deprivation of Property Interest**

> **(d) Use of Arbitrary Classification and Irrebuttable Presumption in Violation of Due Process**

**PROCEDURAL DUE PROCESS VIOLATION, INADEQUATE PROCESS LED TO ERRONEOUS OUTCOME AND IRREPARABLY HARMED PLAINTIFF'S STANDING AND REPUTATION, AND DEPRIVED THE FREEDOM TO PURSUE PLAINTIFF'S OCCUPATION OF CHOICE**

67.     Plaintiff's good name, reputation, honor, and integrity are irreparably harmed because of

Defendant's actions.  A student has a recognized liberty interest in the potential impact of

suspension on reputation and on later educational and employment opportunities.  *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).  Once a grant of the benefit of public education is afforded, a student has a constitutional property interest in that education.  *See Smith v. Denton*, 320 Ark. 253, 261 (1995) *("To deprive a student of her educational property interest on narrowly formal grounds as exemplified in these circumstances is to violate the spirit of procedural due process")*.

68.     The Due Process clause forbids arbitrary deprivations of liberty.  *Goss v. Lopez*, 419 U.S. 565, 574 (1975).  Disciplinary action that results in student suspension constitutes a deprivation of liberty and property interests because the allegations and suspension will damage the student's reputational standing, and future associational, higher education, and employment opportunities.  *See Goss*, 419 U.S. 565 (1975).

69.     The standard for evaluating a constitutional claim for damage to reputation by the government is the stigma-plus test.  *See Paul v. Davis*, 424 U.S. 693 (1976).  The standard requires a reputation injury and state action that alters or extinguishes a legal status or right.  *Id.*.  And there must be a statutory right that was altered by state action when the claim is outside the employment context.  *Id.*.

70.     Beginning with the statutory right determination, Plaintiff and Defendant enjoyed a contract.  Plaintiff and Defendant had mutual understanding and assent that as long as she paid necessary fees, made required academic progress, and did not commit a violation of the code of conduct there exists an entitlement to continued enrollment.  Defendants' conduct codes state and Plaintiff understood the use thereof to be one that does not invoke punishment or suspension of students without cause.

71.     The stigma requirement is satisfied by the written communication Defendant and law school faculty and staff authored about Plaintiff, including but not limited to email communication sent to the UAPD that Plaintiff suffered from a psychiatric condition and needed medication.  The stigma requirement is further satisfied by the requirement that Plaintiff miss class and attend a meeting with Defendant's officials who evaluated her mental state without her consent, thus exposing Plaintiff to isolating and embarrassing treatment.  Further, Plaintiff was required to use a UAPD escort to retrieve her textbooks and personal belongings, subjecting her to humiliation and irreparable reputational harm in front of law school colleagues and university students.  At present, Plaintiff is unable to enjoy the employment and resultant monetary benefits of the legal education she possesses because of the stigma Defendant's actions create.

72.     The state action requirement is met by Defendant's action of suspension and is underscored by the lack of any pre-deprivation process.

73.     Additionally, because of the employment options available only to law students, Defendant is culpable for a deprivation of Plaintiff's legal status as a law school student thus inflicting reputational damage and deprivation of the right to pursue the occupation of her choice.  *Doe v. Purdue Defendant*, 928 F.3d 652, 661 (7th Cir. 2019), citing *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) *("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling")*.

74.     The standard for evaluating whether Defendant unlawfully infringed Plaintiff's liberty and property interest is the Due Process Clause.  When Defendant sought to exercise its discretion in the management of student conduct and terminate Plaintiff's access to education, it

had a duty to provide: (1) adequate notice of the charges; (2) a neutral decision maker; (3) a chance for Plaintiff to confront the witnesses and evidence used against her; (4) a decision based on the record with a statement of reasons for the decision; (5) consideration of the value of additional or substitute safeguards and the risk of erroneous deprivation; and, (6) use of the the least restrictive means to achieve its interest. *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Jegley v. Picado*, 349 Ark. 600, 631–32, (2002), (*finding that government action that infringes upon a fundamental right must be implemented in the least restrictive method to achieve its interest*). Absent exigent circumstances, Plaintiff is entitled to notice and a hearing prior to the issue of an order that constitutes an infringement of liberty or property. *See Connecticut v. Doehr*, 501 U.S. 1 (1991), (*finding no governmental or societal justification for the taking of individual property prior to receipt of a hearing*).

75.     Defendant's conduct alleged herein constitute a failure of its duty under the Due Process Clause.


**DUE PROCESS VIOLATION, RIGHT TO AN IMPARTIAL ADJUDICATOR AND A MEANINGFUL HEARING**

76.     The Due Process Clause requires that a hearing is a real one, not a sham or pretense. *Doe v. Purdue University*, 928 F.3d 652, 661 (7th Cir. 2019). Hearings are fundamentally unfair when no attempt is made to evaluate credibility of evidence or probe intent. State supported institutions of higher learning have broad discretion in the promulgation and implementation of disciplinary measures unless it is shown by clear and convincing evidence that the university abused its discretion. *Smith v. Denton*, 320 Ark. 253, 258 (1995), *citing Springdale Board of Education v. Bowman*, 294 Ark. 66, (1987).

77.     Plaintiff was not provided a neutral decision-maker.  The hearing officer made the decision to suspend Plaintiff without speaking to Plaintiff or making a finding of a direct threat.  Given the hearing officer's adequate credentials, the only probable explanation for a finding that is so disproportionate to the facts and the issue is that bias exists.  Plaintiff raises a bias challenge because: (1) a determination of guilt was made on no factual or evidentiary basis, and (2) the hearing officer pre-determined guilt and the need for suspension without the necessary basis as required in Defendant's self-authored codes of conduct.

78.     School disciplinary officials are entitled to a presumption of impartiality, absent a showing of actual bias.  *Doe v. Cummins*, 662 Fed. Appx. 437, 449 (6th Cir. 2016).  But a decision against the substantial weight of the evidence and inconsistent with ordinary practice on sanctions may give rise to an inference of bias.  *Doe v. University of Arkansas – Fayetteville*, 974 F.3e 858 (8th Cir. 2020).

79.     Plaintiff was denied access to Defendant's faculty and staff and was required to use Defendant's conduct office staff as an intermediary to conduct inquiry as to witness' appearance and testimony at the appeal hearing.

80.     Defendant's conduct alleged herein constitutes a violation of Plaintiff's rights under the due process clause.


**PROCEDURAL AND SUBSTANTIVE DUE PROCESS VIOLATION, INADEQUATE NOTICE CAUSED DEPRIVATION OF PROPERTY INTEREST**

81.     Plaintiff has a contracted property interest in her almost-completed doctorate of juris prudence.  The law school provided no notice or opportunity to respond before it deprived Plaintiff of her constitutional property.

82.     The U.S. Supreme Court assumed "the existence of a constitutionally protectible property right in [a university student's] continued enrollment," in *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 222-23, (1985).  There the Court held that where such a right exists, the student's property interest gives "rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action." *Id.*.

83.      In a 1969 opinion, the Eighth Circuit Court of Appeals held that while a college has the power to promulgate rules and regulations, "flexibility and elbow room are to be preferred over specificity; that procedural due process must be afforded by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures." *Esteban v. Central Missouri State College*, 415 F.2d 1077, 1089-90 (8th Cir. 1969).  The test, the Court said, is one of reasonableness. *Id.*.

84.     Plaintiff was suspended without prior notice of a conduct concern or any credible risk of danger.  Defendant's conduct alleged herein constitutes a violation of Plaintiff's rights under the due process clause.


**USE OF ARBITRARY CLASSIFICATION AND IRREBUTTABLE PRESUMPTION IN VIOLATION OF DUE PROCESS**

85.     Defendant unlawfully applied an arbitrary classification and irrebuttable presumption when it labeled Plaintiff with questionable character and fitness and deprived Plaintiff of a government benefit without use of any evidentiary standard or finding of fact.  The Supreme Court holds this practice is invalid and in violation of Due Process.  *See Cleveland Bd of Ed. v. LaFleur*, 414 US. 632 (1974).  In *LaFleur* the Court invalidated restrictions on pregnant teachers imposed by the school without any individualized determination of their ability to continue working during their pregnancy. *Id.*.  The facts in Plaintiff's case are analogous.

86.     Whether a classification is permissible is determined by evaluating whether the individual classified by the practice is dissimilar and the bases upon which the government agency distinguishes them.  There is a general requirement that any determination in a process used to determine deprivation of a liberty interest is made by an objective fact finder.  Defendant's employee who made the decision to impose interim suspension also conducted the administrative hearing thus precluding objectivity.  How feasible is it that the employee would overrule her own decision to impose interim suspension when doing so functions as an admission to culpability in a civil suit?

87.     Defendant demanded Plaintiff receive medical and mental health treatment and release her medical records to a third-party because of an arbitrary classification and an irrebuttable presumption it applied.

88.     Defendant's actions alleged herein constitute a violation of Due Process.

89.     Plaintiff asks the Court declare unconstitutional Defendant's practices of allowing student's character and fitness to be questioned without justifiable cause supported by legal precedent.

## VIII. REQUEST FOR RELIEF AND RESTITUTION

90.     Plaintiff asks the Court to enjoin Defendant from enforcement of the current conduct sanctions, including the suspension, and order Defendant to reinstate Plaintiff with her conduct and education records cleared of this matter.

91.     Plaintiff asks the Court to declare judgment against the Defendant on the violations complained of herein and enjoin Defendant from continued unlawful conduct.

92.     Plaintiff asks the Court order Defendant to restore her to her rightful position relative to her access to financial aid and to priority enrollment for the upcoming semester, and to any

other resources or provisions that may have been or may be effected. Plaintiff asks the Court

order Defendant refund Plaintiff's tuition and other educational expenses for the fall 2021

semester.

93.     Plaintiff asks the Court to order Defendant to pay compensatory damages and the costs

and fees of this suit.

94.     Plaintiff asks the Court for any other relief the Court deems just and equitable.


Respectfully submitted this 11th day of July, 2022.


Joan Doe, Plaintiff pro se

7 North Waterloo Road, #254
Devon, Pennsylvania 19333
479-372-2892
Sunshinecharlie13@yahoo.com

**Temporary Mailing Address**
**To be used for this matter:**
731 Walker Street
Centerton, AR 72719

CERTIFICATE OF SERVICE

I, J. Doe, state under penalties of perjury that I will, on this 12th day of July, 2022, mail, using registered return receipt, and email a true and correct copy of this Complaint to the Defendants named herein—once the Clerk of the Court provides a sealed Summons.

Though I proceed as a pro se litigant, under Sect. 7 of Administrative Order 21, I understand registered users of the electronic system may receive service of documents electronically.

Respectfully submitted this 11th day of July, 2022.

Joan Doe, Plaintiff pro se

7 North Waterloo Road, #254
Devon, Pennsylvania 19333
479-372-2892
Sunshinecharlie13@yahoo.com

**Temporary Mailing Address**
**To be used for this matter:**
731 Walker Street
Centerton, AR 72719