UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

JOAN DOE                                                      PLAINTIFF

v.                                No. 5:22-cv-05137

BOARD OF TRUSTEES FOR THE UNIVERSITY
OF ARKANSAS, et al.                                          DEFENDANTS

**OPINION AND ORDER**

Before the Court are Defendants' motion (Doc 50) for summary judgment, brief (Doc. 52) in support, and statement of facts (Doc. 51).  Plaintiff Joan Doe, who proceeds pseudonymously and *pro se*, filed an untimely motion (Doc. 55) for an extension of time to respond, followed by the untimely response (Doc. 56) itself.  Defendants filed a reply (Doc. 57).  For the reasons given below, Defendants' motion will be GRANTED.

**I.   Background**

Joan Doe, a former student at the University of Arkansas' (hereinafter "University") School of Law (hereinafter "Law School"), saw her academic life thrown into turmoil after complaining about harassment she experienced on campus.   The summary judgment record discloses the following:

Doe enrolled at the Law School in 2018.  (Doc. 50-1, p. 6 (internally numbered 20:13, 21:11–13)).  Section 3-701 of the Law School's Code of Conduct states that:

> Students entering Law School are expected . . . to conform their conduct while in Law School to the professional standards required by the Law School Student Code of Conduct . . . and to be able to satisfy requirements for admission to the Bar.  In addition to a bar examination, there are character, fitness, and other qualifications for admission to the bar in every U.S. jurisdiction.

(Doc. 50-11).  The Law School's academic policies state that

1

all students must be able to satisfy the requirements for admission to the bar.  In addition to other requirements, this means that all students must be able to demonstrate that they meet requirements of good moral character and mental and emotional stability that are imposed by the Arkansas Board of Examiners . . . .

The inability or failure to meet . . . these standards may subject the student to administrative action, including, but not limited to, the imposition of conditions upon enrollment[,] suspension, or expulsion from the School of Law.  Such conditions may include, without limitations, requirements that a student obtain medical evaluation, treatment, [or] counseling . . . .

(Doc. 50-15, p. 2).  These policies were in place during the events at issue in this lawsuit.  (Doc. 50-17, p. 2).

The Arkansas Rules Governing Admission to the Bar, referenced in the above policy, state that "every applicant for admission . . . must be of good moral character and mentally and emotionally stable."  Ark. R. Gov. Admission to the Bar XIII(B) (effective 2004).  The rules additionally state that "conduct that evidences current mental or emotional instability that may impair the ability to practice law" may be considered in the bar admissions process.  Ark. R. Gov. Admission to the Bar Reg. 8(a)(10).   However, applicants are not penalized for seeking help through the Arkansas Bar's Judges and Lawyers Assistance Program (JLAP) for any "disorder . . . that might impair the applicant's ability to practice."  *Id.* at 8(d).  In fact, if the applicant successfully completes a JLAP program designed to rehabilitate them before their graduation, this success "shall be considered favorably by the Board [of Examiners] when evaluating the applicant's character and fitness."  *Id.*  Conversely, "failure to complete a treatment program may be considered adversely by the Board."  *Id.*

Before the Board of Examiners passes on an applicant's moral character and mental fitness, it seeks guidance from the applicant's law school.  The Law School "is required to certify" to the relevant state bar "whether students who apply to take the bar exam have the character and fitness to practice law, including mental and emotional stability."  (Doc. 50-17, p. 3).  Tiffany Murphy,

the Law School's Associate Dean of Academic Affairs, has commented that "[c]ertifying individuals who are not mentally and emotionally stable to the bar would do a great disservice to the public that the School of Law serves.  An attorney's mental and emotional instability could manifest itself in a myriad of ways that would be detrimental to their client's representation and to the public."  *Id.* at 4.  Accordingly, she says that "[c]ertification decisions are among the most important decisions that a law school can make[.]"  *Id.*

Doe indicates that she began to experience harassment during the spring semester of her first year at the Law School.  (Doc. 50-1, p. 8 (internally numbered 27:17–19)).  She describes groups of "three or four individuals . . . reenact[ing] something painful or traumatic" that she or her family had experienced.  *Id.* at 7 (internally numbered 29:15–22.).  She also describes being followed by groups of people even during times of low foot traffic and after detouring to out-of-the-way, unoccupied areas.  *Id.* at 10 (internally numbered 35:24–37:17)).  Some of these individuals, she states, looked "identical" to people she knew and acted "in an aggressive manner that seems to be designed to provoke an allegation on my part."  *Id.* at 8 (internally numbered 27:20–25).

By August of 2021, the harassment had escalated to include "use of electric weapons that targeted my genitals, targeted my dog, targeted my devices like my phone, my computer, my key fob." (Doc. 50-1, p. 7 (internally numbered 24:25–25:7)).  She characterized the weapons at issue as being banned in several states[1] and as being "silent.  They are invisible.  They are used to

---

[1] Ms. Doe specifically named Maine and Pennsylvania as having such bans.  (Doc. 50-1, p. 21 (internally numbered 78:22–23).  Maine generally proscribes the use of "a portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to have a disabling effect on human beings."  Me. Stat. tit. 17-A, § 1004.  This includes Taser guns.  *State v. Murphy*, 10 A.3d 697, 699–700 (Me. 2010).  Pennsylvania, meanwhile, restricts the use of "any stun gun, stun baton, taser or other electronic or electric weapon."  18 Pa. Stat. and Cons. Stat. Ann. § 908(c).

incapacitate a person.  They can traverse brick walls [and] concrete." *Id.* at 9 (internally numbered 32:24–33:3).  Doe purports to be familiar with "a lot of literature specific to the use of these weapons by mental health workers . . . . to identify individuals who suffer from mental illness but are undiagnosed or undertreated and present a threat to the community.[2]  So if you're hit with one of these lasers or weapons and you're already mentally unstable, then it could cause an episodic break, and that would allow the authorities to document the break." *Id.* at 9–10 (internally numbered 33:21–34:6).  Doe says that the device seems to have various settings, ranging from annoying to painful to sexually stimulating.  (Doc. 50-2, p. 31).

The local authorities have been unwilling to assist Doe regarding these matters.  She recounted one incident in which she was unable to open the doors to her home, was told by a locksmith that the locks on all of her doors had been drilled out, and called the local police only to be told that "it's an old house, and locks just stop working." (Doc. 50-1, p. 14 (internally numbered 52:2–8)).  She believes that the local authorities "know what's happening" because they are "laughing about it" rather than investigating the crimes. *Id.* (internally numbered 53:6–9).

Doe infers that "the [Arkansas] Department of Education and the Department of Health are involved" in the harassment, but cannot say for certain.  (Doc. 50-1, p. 11 (internally numbered 41:18–25)).  Her theory is that "there is a vetting process that goes on your 1L year [first year of law school].  It's undocumented and informal on purpose; and the things that are done are – are illegal, but they're done by people who have complete immunity," to include JLAP. *Id.* at 14 (internally numbered 50:17–21).

On August 30, 2021, Doe e-mailed three of her professors to let them know that she would likely be unprepared for class, including being unable to turn in one assignment.  (Doc. 50-2, pp.

---

[2] Doe did not introduce any such literature into the record.

4

47–48).  In these e-mails, she described "debilitating harassment and abuse" which "negates any reasonable opportunity to read, comprehend, or complete assignments."  *Id.* at 48.  Doe claimed that she was unable to contact the authorities for help because she had no proof the abuse was happening.  *Id.*  Despite the e-mail, Doe ultimately completed her assignment on time.  (Doc. 50-1, p. 17 (internally numbered 62:8–9)).

A few days later, Doe sent more e-mails to various faculty members.  (Doc. 51, p. 5).  In one, she claimed that she was "sexually violated and stimulated" during a standardized test, voicing suspicions that those responsible had accessed the test database to artificially increase her score afterwards.  (Doc. 50-2, p. 31).  Another described the profound impact of the harassment on her day-to-day life, her fear that the perpetrator was "embedded with or aligned to the police," and her hope that the faculty (including one federal district judge) could intervene on her behalf to keep the perpetrators from accessing her residence and vehicle.  *Id.* at 32–33.

These e-mails found their way to Susannah Pollvogt, the Law School's Associate Dean of Student Success.  On September 7, 2021, Pollvogt contacted Doe and expressed concern for Doe's well-being and ability to prepare for class, stating that the Law School administration was "concern[ed] about our ability to certify your character and fitness to practice law, which is required for you to be admitted to the bar."  (Doc. 50-2, p. 34).  Because of this, Pollvogt required Doe to meet with Associate Dean of Students Monica Holland and CAPS[3] Director Josette Cline the next day.  *Id.* at 35.  Pollvogt stated in her e-mail that she was imposing the requirement "[p]ursuant to Sections 6-701, 6-702, and 6-703 of the Faculty Policies Manual."  *Id.*  She also stated that if Doe did not attend the meeting, "we may not be able to certify your character and

---

[3] Counseling and Psychological Services.  (Doc. 50-2, p. 42).

fitness in accordance with Section 6-702." *Id.* There is no evidence that Doe had access to the Faculty Policies Manual at the time.

Doe initially declined to attend the meeting, but was "told that [she] would effectively be unenrolled" if she did not participate. (Doc. 50-1, p. 16 (internally numbered 60:5–9)). Beginning with this meeting, Doe says she was "overtly treated like a person with a serious mental illness" during face-to-face interactions with school officials. *Id.* (internally numbered 60:12–15)). After the meeting, Pollvogt sent an e-mail to Doe requiring her to "call Jennifer Donaldson of JLAP[4] in the next 24 hours to discuss counseling options," address future complaints about harassment only to Pollvogt, and continue attending classes and completing assignments on time. (Doc. 50-2, pp. 1–2). Pollvogt stated that Doe's ability to perform these tasks would "play a role in our character and fitness determination." *Id.* at 2.

Doe called Donaldson as instructed, discussed counseling options, and reported back to Pollvogt. (Doc. 50-2, p. 3). Pollvogt then directed Doe to "follow the course of action recommended by [Donaldson], including but not limited to a series of counseling appointments." *Id.* at 4. Doe responded that Donaldson only offered counseling as "an option" and did not recommend it outright. *Id.* The next day, Pollvogt told Doe that "[a]s the next step in our character and fitness process, you are required to contact Ms. Donaldson again and arrange for a psychiatric evaluation through JLAP." *Id.* at 5. The evaluation would be conducted through a third-party provider, with the information released to the Law School and JLAP. *Id.* at 23.

---

[4] "JLAP, created by the Arkansas Supreme Court in 2000, provides behavioral health and substance abuse services to Arkansas judges, lawyers, their family members, and law students." *History of JLAP?*, ARKANSAS JLAP, https://www.arjlap.org/history. Among other things, it offers "free and confidential" assessment and referral services. *Services*, ARKANSAS JLAP, https://www.arjlap.org/services.

Several days later, Doe wrote to Pollvogt and stated that she was still being harassed.  (Doc. 50-2, p. 5).  Doe described her conversations with University police about the harassment as "wholly unproductive and offensive," noted that she had moved out of a third hotel because of a mold problem, and requested help from the Law School to obtain housing "free of mold and free of harassment, or to influence the police/housing department to do their jobs to the same end[.]" *Id.*  After Pollvogt directed Doe to contact another dean for help with housing, Doe stated: "I need help with housing in the same way that the colonies needed help using their words with the King. I ask again for a path to a solution for the harassment and abuse, and rampant mold, that impede reasonable access to safe housing in Fayetteville.  When or if I sign a lease at a mold-free apartment, who is going to act when I am harassed and abused there in the same way I have been[?]"  *Id.* at 12.

Doe e-mailed Pollvogt again on September 13, requesting the Law School's source of authority for ordering the evaluation as well as details on any applicable privacy protections.  (Doc. 50-2, p. 40).  Doe stated that she had called Donaldson to schedule the evaluation.  *Id.*  In the same e-mail, she stated that she had spent the past four nights in a tent, a lakeside cabin, and her car in an unsuccessful attempt to keep her assailants from disrupting her sleep.  *Id.* at 40–41.  She asked Pollvogt to "do what is right and use your positional authority to seek hold [sic] whoever is abusing their power and access to account."  *Id.* at 41.  Pollvogt responded that the authority to request the evaluation "stems from the mandate that we certify your character and fitness upon graduation" and attached the relevant provisions of the faculty code.  *Id.* at 42–44; *see also* Doc. 50-17, p. 2 (authenticating attached code sections).

Section 6-701 of the Law School's faculty code states that "[a] student who exhibits behavior that suggests or portends an inability to demonstrate character and fitness required to

practice law may be required to participate in [JLAP or CAPS] or report to the All University Conduct Board (the AUCB) that oversees student disciplinary matters." *Id.* Section 6-702 describes the procedure for mandating a student's JLAP or CAPS participation and provides that "members of the law school community may report . . . student behavior that may be considered for JLAP, CAPS, or the AUCB." *Id.* Section 6-703 states that failure to comply with a request to attend JLAP "shall be considered an act of disobedience to educational authority that may, in the discretion of the Dean, result in" a notation on the student's academic record or a report to the bar. *Id.* at 43. Faculty members may also, if appropriate, "refer[] a student to the Honor Council for a violation of the Student Code of Conduct." *Id.* at 44.

Also on September 13, Doe told Pollvogt that the dean assigned to help her with housing had

> directed me to work with University police regarding the harassment and abuse. The University police were beyond unhelpful. Given this, it doesn't appear going back to [that dean] to obtain a solution for the impediments to safe housing is a viable option.

> You might be interested to know about the various impediments of hacking and harassment that violated my prior attempt to responsibly rehome my dog. Or that around the same timeframe, my dog was drugged in a plain attempt to mimic an event that occurred with my child. If you aren't interested to know these things, someone surely should be.

(Doc. 50-9).

On September 16, Doe wrote to Donaldson and objected to the contents of the medical release authorization needed for Doe's evaluation. (Doc. 50-2, p. 13). Doe was unwilling to certify that she consented to the evaluation "voluntarily and without coercion." *Id.* at 14. She also objected to the scope of JLAP's liability waiver, to an exception to Doe's authority to revoke the authorization, and to a provision indicating that the results of the evaluation might not be protected by privacy laws. *Id.* Donaldson stated that it would not be possible to change the form. *Id.* at 15.

8

Doe told Donaldson that "[t]he practice of law is a noble calling that I do not take lightly.  Since the law school has concerns about my mental fitness, the only responsible choice is to take reasonable measures toward resolution."  *Id.* at 38.

On September 19, Doe wrote to Pollvogt describing

a degree of genital violation and other physical manipulation today while in the law school that is unprecedented for that location.  It was coupled with heavy albeit juvenile doses of harassment when I attempted to walk my dog on campus.

I urge whomever is authorizing this incompetent and degrading activity to seek a recognizable standard of operation.  What is being done is abusive, demeaning, and void of any virtue.

I expected more from this state and from the law school.  We should all expect so much more.

(Doc. 50-10, p. 2).  In response to Pollvogt's request for details, Doe provided a diagram of a "Wireless Power Transfer Project" and described the locations in which she had experienced harassment.  *Id.* at 1.

Finally, on September 21, Doe wrote to Pollvogt that

in the law school library the same sort of electric device used to harass, abuse, and violate is being used to interfere with my body as I attempt to study.  I was severely harassed last night at a local hotel.  The device has been used to manipulate my sleep, create extreme sleepiness during the day, and impair or vary other cognitive and physiological functions. . . . I again ask that the activity cease, and if for whatever reason this is not an option, that an explanation be offered and [] that an objective person conduct an immediate review . . . . [w]hat is happening violates any standard of decency and cannot possibly b[e] approved by any licensing authority.

(Doc. 50-8, pp. 1–2).  According to Pollvogt, "Ms. [Doe]'s reports indicated that she was not mentally and emotionally stable, that she was not able to satisfy the character-and-fitness requirements for admission to the bar, and that she did not meet the essential eligibility requirements to be a student in the University of Arkansas School of Law."  (Doc. 50-14, p. 3).  Pollvogt was concerned that mental or emotional instability would interfere with Doe's ability to

give sound advice, provide competent representation, and interact professionally within the court system. *Id.* at 4. She also worried that Doe's mental and emotional state was interfering with her academics. *Id.* Pollvogt believed that an evaluation was required to determine whether the Law School could certify Doe for admission to the bar. *Id.*

On September 27, 2021, Pollvogt told Doe that the Law School required the results of Doe's evaluation "[i]n order to continue with the character and fitness process" and requested that Doe arrange with Donaldson to provide the information by the next day. (Doc. 50-2, p. 22). Doe replied that, to protect her privacy, she was willing to share the results with the law school but not with Donaldson. *Id.* at 23. Pollvogt asserted that "the character and fitness process" required Donaldson to review the evaluation and provide a recommendation. *Id.* Doe responded that she could not meet the deadline because she needed to consult her attorney. *Id.* at 24. Doe further requested the policy requiring that her medical information be shared with JLAP. *Id.* Pollvogt stated that the relevant policy was Section 6-702 of the Faculty Policies. *Id.* at 25. Pollvogt further explained that Donaldson needed authorization to speak directly with the evaluator, and that failure to provide that authorization (or delays to speak to an attorney) would lead to Doe "be[ing] considered not in compliance with the process." *Id.* The consequences of noncompliance were not described. When pressed as to what part of Section 6-702 allowed the Law School to override Doe's privacy rights, Pollvogt said: "Section 6-702(4) allows us to take 'other appropriate action' when we have concerns about character and fitness. Our concerns here mandate that you have a psychological evaluation and have Ms. Donaldson provide a recommendation based on that evaluation." *Id.* at 26–27.

On September 28, Pollvogt reiterated her demand that Doe provide a release so that Donaldson could speak with Doe's evaluator. (Doc. 50-2, p. 27). Doe responded that she could

not do so that day, but Pollvogt insisted that the process was straightforward and that Doe "can and should do this today." *Id.* at 27–28.

On September 29, Pollvogt asked Doe if she had provided the consent form to Donaldson. (Doc. 50-16, p. 1). Doe replied that she had not and would not until she consulted her attorney. *Id.* Pollvogt gave Doe until noon on the 30th to either provide the form to Donaldson or report back on the attorney consultation. *Id.* Pollvogt stated that "[f]ailure to comply will require me to consult with the University Office of the Dean of Students for possible implementation of interim measures and/or Code of Student Life violations." *Id.* at 2. Doe replied that she understood, but said: "I doubt I will be able to comply with that deadline. I am unwilling to release my personal medical information to Ms. Donaldson or the law school at this time." *Id.*

On September 30, Rachel Eikenberry, the Director of the University's Office of Student Standards and Conduct, imposed an interim suspension on Doe. (Doc. 50-3). Eikenberry alleged that Doe had violated three provisions of the University's Code of Student Life, specifically: "F38. Failing to comply with orders or directives of University officials . . . F31. Harboring or bringing a pet on University premises in violation of University policy. . . [and] F11. Disorderly conduct." *Id.* at 1. The terms of the suspension meant that Ms. Doe was required to leave the campus immediately and only return if accompanied by campus police. *Id.* at 2. Doe was also required to participate in a preliminary hearing and was informed of what her rights would be. *Id.* Finally, Doe was told that if she wished to challenge the terms of the interim suspension itself, she needed to contact Dean of Students Melissa Harwood-Rom to request a separate meeting. *Id.* at 3. Doe never contacted Harwood-Rom. (Doc. 50-4).

Following the preliminary hearing, an administrative hearing was held on October 13. (Doc. 50-5). One week later, Eikenberry issued a decision. (Doc. 50-6). Doe was found

responsible for all three charges "based on the information contained within the student's file." *Id.*
at 2.  Doe was suspended until the beginning of the Fall 2022 semester.  *Id.*  In the interim, Doe
was required to seek mental health treatment at her own expense, comply with the mental health
professional's recommendations, and authorize the professional to release treatment information
to Eikenberry before Doe could re-enroll.  *Id.* at 3.  Upon her return, Doe was to be placed on
probation, meaning that she would not be considered in good standing with the University and
would be unable to hold a leadership position in a University-affiliated group.  *Id.* at 2.

Doe appealed the decision to the AUCB.  (Doc. 50-7).  The AUCB shortened Doe's
suspension so that it ended in May of 2022, but did not alter Eikenberry's findings or make other
changes to the sanctions.  (Doc. 50-13).

After serving the term of her suspension and complying with the treatment and disclosure
requirements, Doe re-enrolled.  (Doc. 50-1, p. 6 (internally numbered 21:14-18)), (Doc. 50-18, p.
1).  She graduated from the Law School in May of 2023.  *Id.*

## II.   Procedural History

This is not the first suit Ms. Doe has brought on these facts.  On December 23, 2021, she
filed a *pro se* case entitled *Doe v. University of Arkansas – Fayetteville*, No. 5:21-cv-05231-PKH,
in this Court.  She named the University, the Law School, the University's Board of Trustees,
University CEO Donald Bobbitt, the Arkansas Board of Higher Education, and the Arkansas Board
of Law Examiners as defendants.  Doe accused these defendants of violating Title II of the
Americans with Disabilities Act (ADA); the Family Educational Rights and Privacy Act (FERPA);
the First, Fourth, and Fourteenth Amendments to the United States Constitution; and several
Arkansas statutes.  This first case was dismissed on March 28, 2022.  Claims against Bobbitt, the
Law School, and the Board of Trustees were dismissed without prejudice for insufficient service

of process.   Claims against the Arkansas Board of Higher Education and Arkansas Board of Law Examiners were dismissed without prejudice for failure to state a claim.   The University was dismissed with prejudice as incapable of being sued.

Doe filed her current suit on July 12, 2022, again proceeding *pro se*.   This time, Doe named only the Board of Trustees, the Law School, and Bobbitt as defendants.   Doe also pared down her list of claims, alleging violations of Titles II and V of the ADA, FERPA, and the Due Process Clause of the Fourteenth Amendment.   Following Defendants' motion (Doc. 12) to dismiss, the Court dismissed the Law School and found that Doe had only stated three claims: one under Title II of the ADA, one under Title V of the ADA, and one for a due process violation related to the interim suspension.   (Doc. 19, pp. 18–19).   Regarding the interim suspension, which was replaced by a formal suspension by virtue of Eikenberry's administrative decision, the Court held that the alleged violation was still reviewable because it was capable of repetition while Doe attended the Law School.   *Id.* at 5.

A Final Scheduling Order (Doc. 32) was entered in this matter on March 7, 2023.   The Scheduling Order instructed that "[a]ll motions, except motions in limine, must be filed on or before August 29, 2023" and that "[l]eave to add parties or amend pleadings must be sought no later than July 17, 2023."   (Doc. 32, p. 2).   The order set trial for November 13, 2023.   *Id.* at 1.

On August 29, 2023, Defendants moved for summary judgment.   (Doc. 50).   Under this District's Local Rule 7.2(a), responses to motions must be filed within 14 days.   September 12, the due date for Doe's response to the motion for summary judgment, came and went with no filings made.   It was not until over two weeks after the due date, on September 28, that Doe filed a motion to extend her time to respond.   (Doc. 55).   In her motion, Doe mistakenly related that her response had been due on September 26.   *Id.* at 1.   She attributed the delay to "her workload and . . . a

personal family matter involving a minor dependent." *Id.*  She stated that she "cannot share the details of the personal family matter involving the minor dependent but suffice it to say that the matter is of extreme seriousness." *Id.* at 2.  Doe requested a "minimum 30-day extension" of her time to respond.  *Id.*  Despite the extension request, she filed her response four days later, on October 2, 2023.  (Doc. 56).[5]  Doe did not dispute any facts presented by Defendants.

In their reply, Defendants characterized Doe as "abandon[ing] claims she pleaded[] and attempt[ing] to raise new claims that are not in her complaint." (Doc. 57, p. 1).  Perhaps in response to these concerns, Doe moved to amend her complaint on October 10.  (Doc. 59).  The proposed amended complaint would add three new defendants (including Pollvogt) and several new claims (First Amendment retaliation; unconstitutional vagueness of the character and fitness evaluation process, faculty policy manual, and Law School academic policies; failure to provide a pre-deprivation procedure; violations of procedural due process by the Student Conduct Office; and violation of the ADA by the Law School's academic policies).  *Id.* at 2–3.

### III.  Motion to Amend

If granted, Doe's motion to amend would moot these summary judgment proceedings; accordingly, the Court will address this motion first.

Eighth Circuit "precedent establishes that '[i]f a party files for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule.'" *Hartis v. Chi. Title Ins. Co.*, 694 F.3d 935, 948 (8th Cir. 2012) (quoting *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008)) (internal quotations omitted).  "Where there has been 'no change in the law, no newly discovered facts, or any other changed circumstance . . . after the scheduling

---

[5] The "Certificate of Service" at the end of the response states that it was e-mailed to Defendants' counsel on September 27.  (Doc. 56, p. 24).

deadline for amended pleadings,' then we may conclude that the moving party has failed to show good cause." *Id.* (quoting *Sherman*, 532 F.3d at 718).

In determining good cause, courts "focus in the first instance (and usually solely) on the diligence of the party who sought modification of the [scheduling] order." *Sherman*, 532 F.3d at 717. Courts "will not consider prejudice [to the nonmoving party] if the movant has not been diligent in meeting the scheduling order's deadlines." *Id.*

Here, Doe filed her motion to amend nearly three months after the deadline to do so had passed. She has pointed to "no change in the law, no newly discovered facts, or any other changed circumstance" to explain why these claims could not have been brought from the outset of this suit or its predecessor, to say nothing of an amendment before the deadline. *MSK EyEs Ltd. v. Wells Fargo Bank, Nat'l Ass'n*, 546 F.3d 533, 545 (8th Cir. 2008) (affirming denial of motion to amend brought "nearly three months after the Rule 16 deadline for amendment, nearly two years after the action was commenced, and after [the plaintiffs] were notified [the defendant] was moving for summary judgment."); *SmithCo Mfg. Inc. v. Haldex Brake Products Corp.*, 267 F.R.D. 250, 254 (N.D. Iowa 2010) ("Good cause is not established when, after the deadline for filing motions to amend pleadings, a party simply rethinks its position and decides to plead its case differently. . . . It appears the proposed amendment would make purely legal changes in the pleadings that could have been asserted within the time allowed for amending the pleadings.") Doe's delay in making these purely legal changes shows that she has not been diligent. Accordingly, Doe's motion to amend will be denied.

## IV.  Summary Judgment Standard

On a motion for summary judgment, the moving party has the burden to show that there is no genuine dispute of material fact and that it is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a).  Facts are material when they can "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Disputes are genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  "[A] nonmovant may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial."  *Haggenmiller v. ABM Parking Servs., Inc.*, 837 F.3d 879, 884 (8th Cir. 2016) (quotations omitted).  The record must be construed in the nonmovant's favor, with "the 'benefit of all reasonable inferences in the record.'"  *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 981 (8th Cir. 2022) (quotation omitted).

## V.    Effect of Late Response

As discussed above, Doe's motion for an extension of time to file her summary judgment response was filed after the deadline to respond had passed.  The Court must now decide whether to grant the motion and consider Doe's response.

"A court . . . may for good cause grant a party's request for an extension of time 'after the time has expired if the party failed to act because of excusable neglect.'" *Albright ex rel. Doe v. Mt. Home Sch. Dist.*, 926 F.3d 942, 951 (8th Cir. 2019) (quoting Fed. R. Civ. P. 6(b)(1)(A)).  However, excusable neglect is a demanding standard.  "[I]nadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect[.]"  *Pioneer Inv. Serv's Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993).  Similarly, "'[e]xcusable neglect' requires something more than a simple failure to meet the deadline due to a busy schedule."  *Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1043, 1048 (8th Cir. 2010) (quoting *United States v. Dumas*, 94 F.3d 286, 289 (7th Cir. 1996)).  An attorney's busy practice, for instance, is not excusable neglect; nor is counsel's preoccupation with other hearings.  *Hawks*, 591 F.3d at 1048; *Albright*, 926 F.3d at 951.  And a family emergency will not establish excusable neglect if it does not explain

16

or account for a missed deadline.  *Jones v. Me. Cat Catamarans, Inc.*, 2021 WL 5348666, at *2 (D. Me. Nov. 16, 2021) (counsel "describes his family's medical emergency (leading to his absence from the office) that occurred after he accepted service, but he does not explain how, without that emergency, his mis-remembering and mis-calendaring [of the deadline] would have been corrected."); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 883 (7th Cir. 2012) ("Although a medical emergency could cause excusable neglect, counsel failed to demonstrate that his illness was of such a magnitude that he could not, at a minimum, request an extension of time to file his response.").

In this case, Doe claims that the delay in her response was due to her workload and a serious but not-to-be-further-specified "personal family matter involving a minor dependent."  It is unclear that either Doe's workload or her family matter constitutes excusable neglect on its own.  Doe proceeds *pro se* in this matter, which makes her busy schedule analogous to a lawyer's heavy caseload.  And while the serious family matter could be considered a family emergency, Doe has affirmatively declined to provide any details from which the Court can conclude that she was unable to file a timely motion to extend.

Even setting these concerns aside, the fact remains that Doe miscalculated the due date of her response by two full weeks.  Under Local Rule 7.2(b), Doe's response was due on September 12.  Doe's motion to extend time reflects that Doe believed the due date was September 26. "[W]here the language of a rule is unambiguous, a party's failure to follow it will not constitute excusable neglect[.]"  *Bennett v. Dr Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002). Doe does not indicate how either her busy schedule or her family emergency could have caused such a misunderstanding, which falls into the category of "mistakes construing the rules [that] do not usually constitute 'excusable' neglect."  *Pioneer*, 507 U.S. at 392; *see also Noah v. Bond Cold*

*Storage*, 408 F.3d 1043, 1045 (8th Cir. 2005) (finding no excusable neglect where party "ha[d] not demonstrated that the facts surrounding his failure to comply with the [scheduling order] amounted to excusable neglect[.]"

Because Doe is unable to demonstrate excusable neglect for the late filing, the Court will deny her motion to extend the deadline. Accordingly, the Court treats Doe's response as not having been filed. However, "failure to respond to [a] summary judgment motion does not automatically compel resolution in favor of [the] moving party[.]" *Mack v. Dillon*, 594 F.3d 620, 622 (8th Cir. 2010). Instead, the above-described standard for granting summary judgment continues to apply, and the Court may only "grant summary judgment if the motion and supporting materials—including the facts considered undisputed[6]—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(3). Accordingly, the Court now turns to the legal merits of Defendants' motion.

## VI. ADA Discrimination (Title II)

Doe claims that Defendants violated her rights under Title II of the ADA by "us[ing their] stated concerns for [Doe's] mental health to screen for disability absent any articulated finding of necessity relative to the provision of education services." (Doc. 2, p. 14). The Court disagrees.

"For a prima facie Title II ADA violation, a qualified individual with a disability must not be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or be otherwise discriminated against by the entity, by reason of the individual's disability." *Folkerts v. City of Waverly*, 707 F.3d 975, 983 (8th Cir. 2013). A "qualified individual" is someone "who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services or the

---

[6] Because Doe's response did not challenge any of Defendants' assertions of fact, and because any such challenges contained in the untimely response would have been deemed as not made, the Court has treated all facts asserted by Defendants as undisputed. Fed. R. Civ. P. 56(e)(2).

18

participation in programs or activities by a public entity." 42 U.S.C. § 12131(2). And a person is considered "disabled" for ADA purposes "if the individual establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment." *Id.* § 12102(3)(A). Construing the facts in Doe's favor, Defendants perceived Doe as having a mental impairment. The question before the Court is whether Doe is a "qualified individual," that is, whether she meets the Law School's essential eligibility requirements.

Defendants rest their Title II argument in part on a number of Law School and Arkansas Board of Examiners policies requiring students to show mental and emotional stability and fitness for the practice of law. But not all requirements are "essential" for ADA purposes. "The text [of Title II] distinguishes between two categories of requirements: (1) rules, policies, or practices, which are subject to the requirement of reasonable modification, and (2) essential eligibility requirements, which are not." *Mary Jo C. v. N.Y. State and Loc. Ret. Sys.*, 707 F.3d 144, 155–56 (2d Cir. 2013). The Eighth Circuit determines whether a requirement is essential "by reviewing the importance of the requirement to the . . . program" at issue. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 930 (8th Cir. 1994). "If this requirement is essential, we then determine whether [the plaintiff] meets this requirement with or without modification." *Id.* at 930–31. In other words, whether a requirement is essential depends on the program broadly; whether a plaintiff can meet it is an individualized inquiry. *Id.*

In *Pottgen*, the Eighth Circuit upheld an age limit for high school sports as an essential requirement because it "helps reduce the competitive advantage flowing to teams using older athletes; protects younger athletes from harm; discourages student athletes from delaying their education to gain athletic maturity; and prevents over-zealous coaches from engaging in repeated

red-shirting to gain a competitive advantage." 40 F.3d at 929.  Despite findings of fact that the plaintiff athlete in that case was "not appreciably larger than the average eighteen-year-old" and "not a threat to the safety of others," the Eighth Circuit held that waiver of the essential eligibility requirement in the athlete's case was impermissible. *Id.* at 931.  And as the only modification that could accommodate the athlete would be a waiver of the essential age requirement, there was no "reasonable" modification which would allow the athlete to participate. *Id.*  Accordingly, the Eighth Circuit ruled that the athlete was not a "qualified individual" for Title II purposes. *Id.*

Other courts have conducted the "essential eligibility requirement" inquiry in the context of professional schools.  The Second Circuit, for example, has held that "[i]t was well within [a medical school's] authority to decide that in order for it to adhere to the demanding standards of a medical school responsible for producing competent physicians, it needed to require" the meeting of certain academic benchmarks. *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir. 2004).  That panel determined that "[p]ermitting a student who did not definitively prove her mastery of basic medical sciences to advance into the later stages of medical school, and become a treating physician who had direct contact with patients[,] was something the medical school correctly believed would unreasonably alter the nature of its program." *Id.*  Similarly, the Fourth Circuit held that "professionalism was an essential requirement of [a] medical school's program" for Title II purposes where the medical school "identified professionalism as a fundamental goal of its education program, . . . required that students demonstrate professional behavior and attitudes prior to graduating" and "emphasized professionalism based on evidence that inappropriate and disruptive behavior by physicians increases adverse patient outcomes." *Halpern v. Wake Forest Univ. Health Sci's.*, 669 F.3d 454, 463 (4th Cir. 2012).  And the Supreme Court has interpreted Section 504 of the Rehabilitation Act, the ADA's predecessor, to allow a nursing school to reject

a deaf applicant because her disability "could interfere with her safely caring for patients."  *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 403 (1979); *see Pottgen*, 40 F.3d at 930 ("[R]ights under Title II are the same as under section 504.").  The Supreme Court noted in that case that

> The uncontroverted testimony of . . . staff and faculty established that the purpose of the program was to train persons who could serve the nursing profession in all customary ways. . . . That type of purpose, far from reflecting any animus against handicapped individuals[,] is shared by many if not most of the institutions that train persons to render professional service[.]

*Davis*, 442 U.S. at 413.

It is apparent from this authority that, in the context of a professional school, requirements aligned with the ability to join and succeed in the relevant profession are properly considered essential.  The purpose of a professional school is ultimately to produce professionals, and as such a professional school is justified in requiring its students to be prepared to join the relevant profession.  This is particularly true for state-run law and medical schools given the "strong state interest in regulating" crucial professions like health and law.  *Keefe v. Adams*, 840 F.3d 523, 530 (8th Cir. 2016).

In this case, the Law School's requirement that students possess the mental and emotional stability to join the bar echoes the Arkansas Board of Examiners' own requirement that prospective lawyers be mentally and emotionally stable in order to join the profession.[7]  As mental and emotional stability are prerequisites for becoming a lawyer in Arkansas, an Arkansas law school run by the Arkansas state government can permissibly treat mental and emotional stability as essential eligibility requirements for its students.  Accordingly, the Court finds that mental and emotional stability were essential eligibility requirements for the Law School's program.

---

[7] Arkansas is not unique in this regard, as "virtually all states" inquire about mental health as part of their bar applications.  54 Causes of Action 2d 1, § 2 (2023).

Under *Pottgen*, the "otherwise qualified" inquiry now shifts to whether Doe could meet the requirement with or without accommodation.  In determining whether Doe could meet the requirement, the Court is obligated to give Doe "the 'benefit of all reasonable inferences in the record.'"  *Schottel*, 42 F.4th at 981 (quotation omitted).  If the Court accepts Doe's statements as factually true, the conclusion that Doe was not mentally or emotionally unstable would follow.  However, inferring the factual truth of Doe's statements would not be a "reasonable inference" on this record.  It is one thing to accept for purposes of summary judgment that Doe's locks were drilled out, that the police have been consistently unprofessional in dealing with her, and that she experiences painful and distracting shock-like sensations.  But the wide-ranging conspiracy Doe posits, one that tormented an ordinary law student for months on end using actors, poison, and a weapon that can send electricity wirelessly through brick walls, is too far beyond the pale of human experience to credit without supporting evidence, of which Doe has provided none.  On this record, the only reasonable inference that the Court can draw is that Doe's reports stemmed at least in part from a degree of mental instability.  The Law School was within its rights to reach the same conclusion.  *Halpern*, 669 F.3d at 466 (no Title II violation "[w]here a professional school has reasonably determined based on an identifiable pattern of prior conduct that a student is unfit to join his chosen profession").

The inquiry does not end there, however.  The Court now turns to whether Doe could become "otherwise qualified" through a "reasonable modification."  Unlike the athlete's age in *Pottgen*, mental instability is not immutable; treatment is available for many underlying causes.  Indeed, both the Law School's policies and those of the Arkansas Board of Examiners contemplate such treatment as an alternative to punishment or disqualification.  Accordingly, construing all

facts in Doe's favor, allowing Doe to seek treatment for her condition would have been a "reasonable modification" which made Doe "otherwise qualified."

The Law School proposed a form of this modification to Doe when it mandated that she receive an evaluation and treatment and disclose those results to the Law School. Doe objected to this based on her privacy concerns, proposing that JLAP should not be involved in the evaluation and treatment process, and later objecting to disclosing the results to the Law School at all. "However, a disabled individual is not entitled to an accommodation of his choice." *Minnihan v. Mediacom Comms. Corp.*, 779 F.3d 803, 813 (8th Cir. 2015) (internal quotations omitted). Instead, the modification need only be "reasonable in terms of costs and benefits." *Mays v. Principi*, 301 F.3d 866, 872 (7th Cir. 2002), *abrogated on other grounds by E.E.O.C. v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012). Insofar as Doe bases her claim on the Law School's refusal to implement Doe's preferred private process for evaluation and treatment, Doe is required to show that the Law School's proposed evaluation process was not a reasonable accommodation of Doe's disability. *See Ehlers v. Univ. of Minn.*, 34 F.4th 655, 661 (8th Cir. 2022) (requiring plaintiff to show that she "could have been reasonably accommodated but for the [defendant]'s lack of good faith"). Doe has made no such showing. Accordingly, Doe cannot prevail on a Title II claim by challenging JLAP's or the Law School's involvement in the evaluation.[8]

To the extent that Doe challenges the permissibility of the evaluation itself, she fares no better. Title II does not contain a prohibition on examinations. However, such a prohibition is

---

[8] Doe's complaint indicates that she views her privacy-related requests to modify *the Law School's evaluation procedures* as Title II "modification requests" in and of themselves. (Doc. 2, pp. 15–16). However, "any modifications requested in a program must be related to the disability." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1078 (8th Cir. 2006) (internal quotations omitted). Doe's requests to modify the evaluation procedures based on privacy concerns are not related to the disability. Accordingly, the denial of such changes does not run afoul of Title II.

found in Title I, which deals with employment.   42 U.S.C. § 12112(d).  Title I provides that "[a] covered entity shall not require a medical examination . . . unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).  For present purposes, this Court will assume that the Title I rule applies in the Title II context.

Under Eighth Circuit caselaw, the "business necessity" with which the examination is "consistent" must be "vital to the business[.]"  *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007).  Per *Thomas*, "[c]ourts will readily find a business necessity if an employer can demonstrate . . . a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties[.]"  *Id.* (quoting *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (2d Cir. 2003)).   Further, "the request for a medical examination or inquiry [may not be] broader or more intrusive than necessary."  *Thomas*, 483 F.3d at 527.

The Court concludes that the Law School's need to certify its students' character and fitness is a "business necessity" which is "vital to the business" of running a law school.  As discussed above, the fundamental "business" of a law school is to produce lawyers.  When a law graduate seeks to become a lawyer, a law school must certify that graduate's character and fitness to the relevant state bar in order for the bar admissions process to go forward.  Therefore, the Law School's ability to certify the character and fitness of its graduates is integral to its central purpose of allowing those graduates to become lawyers—in other words, "vital to the business."

Further, the Law School had "legitimate, non-discriminatory reasons to doubt" whether Doe's apparent mental instability would be compatible with her chosen profession.  The record in this case discloses that Doe assertively pressed her claims of harassment with many professors and

24

administrators at the Law School, including a federal judge, demanding that they use their authority to intervene in the harassment.  This is a legitimate basis for Pollvogt's concern that Doe might not be able to interact professionally with court personnel, especially if she perceived this harassment in a courthouse.   Perhaps more importantly, Doe's mention of the weapon manipulating her cognitive state and impairing her ability to study would have been legitimate grounds for concern about Doe's ability to soundly advise her clients and perform legal research tasks.   Given the foregoing, the examination was job-related and consistent with business necessity.

Finally, the examination was not "broader or more intrusive than necessary."   An examination "need not be the only way to achieve a business necessity, but it must be a reasonably effective method to achieve the employer's goals."  *Thomas*, 483 F.3d at 527.  Here, the Law School reasonably believed that Doe was not mentally stable.  It did not, however, know the cause of this instability, its prospects for treatment or management, or what effect it would ultimately have on Doe's ability to practice law.  Faced with these significant unknowns, the Law School reasonably opted for a comprehensive evaluation in order to gather the information it needed to accurately evaluate Doe's character and fitness.

Because the Law School's evaluation of Doe was permissible under the ADA, the Court will grant summary judgment to Defendants on Doe's Title II claim.[9]

## VII.  ADA Retaliation (Title V)

Doe claims that her suspension was unlawful retaliation for refusing the examination.  The Court disagrees.  To demonstrate retaliation under the ADA, a plaintiff must show that "(1) she

---

[9] Because Doe has no valid Title II claim against Defendants, the Court need not reach the issue of Defendants' sovereign immunity.  *See Lors v. Dean*, 746 F.3d 857, 864 (8th Cir. 2014).

engaged in a statutorily protected activity, (2) the [defendant] took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013).  It is undisputed that the Law School took adverse action against Doe by suspending her.  However, even assuming that Doe's refusal to disclose the results of her examination was protected conduct, there is an insufficient causal connection between Doe's refusal and her suspension.

*Hustvet v. Allina Health System*, 910 F.3d 399 (8th Cir. 2018), is on point here.  In that case, a therapist who worked with immunocompromised patients was fired for refusing a vaccine over allergy concerns.  *Id.* at 405.  The therapist sued her employer under Title V.  *Id.*  Even construing opposition to the vaccine as protected conduct, the Eighth Circuit found that the "record does not support a conclusion that [the employer] terminated [the therapist's] employment because she requested an accommodation," in this case an exemption from the vaccine requirement.  *Id.* at 412.  Instead, the court held, the therapist was fired "because her job required her to work with potentially vulnerable clients and she refused to comply with [employer] policy by completing the required health screening and becoming immunized to rubella."  *Id.* at 412–13.

Another helpful case is *Shklyar v. Carboline Co.*, 616 F. Supp. 3d 920 (E.D. Mo. 2022).  There, an employee who objected to her employer's COVID policies was fired for noncompliance.  *Id.* at 920–21.  The court held that "[g]iven that the adverse action taken against [the employee] was taken pursuant to policies that were implemented before [the employee] engaged in her alleged protected activity, it is not reasonable to infer that there was a causal connection between the two events."  *Id.* at 927.

In this case, it is undisputed that the Law School's Code of Conduct provided at all relevant times that continued enrollment could be conditioned on undergoing treatment.  It is further

undisputed that, per the faculty manual, failure to participate in JLAP "shall be considered an act of disobedience to educational authority" and could be referred to the AUCB.  Doe was ultimately suspended for, among other things, "failure to comply with orders or directives of University officials."  The terms of her suspension included seeking mental health treatment and releasing her treatment information to the Law School.  In other words, the adverse action against Doe was taken pursuant to a preexisting policy and in line with that policy, such that it is unreasonable to infer that the University acted with a retaliatory motive.

Accordingly, summary judgment will be granted for Defendants on Doe's Title V claim.[10]

## VIII.  Procedural Due Process

Finally, the Court turns to Doe's claim for a violation of procedural due process.  As noted above, this claim survived Defendants' motion to dismiss only as to the interim suspension, not the formal suspension imposed by Eikenberry after a hearing and later modified by the AUCB.  Further, the claim survived on the theory that such a suspension was capable of repetition, but evaded review.  Since the Court issued its order on Defendants' motion, however, Doe has graduated from the Law School.  Because Doe cannot face a second interim suspension at the Law School's hands, the harm is no longer capable of repetition.  Accordingly, unless there is a continuing harm flowing from Doe's interim suspension, her procedural due process claim is moot.

*McNaught v. Nolen*, 76 F.4th 764 (8th Cir. 2023), dealt with the issue of continuing harm to reputation arising from a suspension.  In that case, a pilot failed to produce records to a regulator and had her license suspended as a result.  *Id.* at 766.  While the pilot successfully appealed the

---

[10]Again, the Court does not reach Defendants' sovereign immunity argument because the Court "need not determine whether Title V of the ADA was a valid abrogation of sovereign immunity if the record on summary judgment establishes that [the plaintiff] has no valid Title V claim against the defendants." *Lors*, 746 F.3d at 864.

suspension, which lasted 14 days in total, the suspension itself remained on her record. *Id.* The pilot sued to have the suspension expunged from her record, citing reputational harm and asserting that future employers would decline to hire her due to the suspension. *Id.*, *id.* at 771–72. The Eighth Circuit held that "[w]ithout more, [the pilot's] alleged harms based on how unspecified employers might interpret a brief suspension is too speculative for Article III purposes." *Id.* at 771 (internal quotations omitted). As for the pilot's claims of reputational harm, the pilot's allegations that the suspension was a "permanent stain on her record" fell "well short of establishing the 'concrete and particularized' injury required for standing." *Id.* at 772 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

A finding of harm arising from discipline is even less likely where a more serious underlying punishment will remain on the plaintiff's record. In *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012), the court found that a plaintiff's "criminal convictions for serious terrorism[-]related charges make it unlikely that he suffers any additional harm as a result of his designation as an enemy combatant." *Id.* at 562. In *McBryde v. Committee to Review Circuit Council Conduct*, 264 F.3d 52 (D.C. Cir. 2001), where a judge was reprimanded and received two suspensions, the suspensions had elapsed, and the judge could not challenge the reprimand itself, the court found that "[t]he legally relevant injury is only the incremental effect of a record of the suspensions . . . over and above that caused by the . . . explicit condemnations" in the reprimand. *Id.* at 57. This injury was held to be insufficient to defeat mootness. *Id.* And in *Friedman v. Shalala*, 46 F.3d 115 (1st Cir. 1995), the court held that a doctor's exclusion from an HHS program based on a valid license revocation conferred no additional stigma on the doctor. *Id.* at 118.

These principles ultimately doom Doe's standing to bring her procedural due process claim. There is no evidence in the record from which the Court can infer that the presence of the

28

interim suspension on Doe's record will harm Doe's employment prospects or generally damage her reputation.  This is especially true because the final suspension, which was based on the same conduct, was valid and will remain on Doe's record in any event.  Therefore, because Doe cannot demonstrate a continuing injury arising from the interim suspension, her challenge to the suspension is moot.  Accordingly, summary judgment will be granted for Defendants on this count.

## IX.  Outstanding Motions

While summary judgment will be granted on all counts for Defendants, there remain a number of motions pending in this matter which the Court will now address:

- Docs. 47 (Motion to Compel), 55 (Motion for Continuance), 60 (Motion to Waive Jury), and 63 (Motion for Service) are now moot.[11]

- Doc. 42 (Motion to Retroactively Seal) will be granted as to Doc. 4, which is unrelated to the merits of the case and contains information about Doe's children; Doc. 9-1, which contains Doe's birthdate; and Docs. 36 and 39, which may be sealed under the terms of the protective order.  Doe will be permitted to refile Docs. 2, 18, 23, and 29 with her address redacted.  The Court finds that the other information sought to be sealed is sufficiently related to this Court's exercise of its judicial power that the public interest in monitoring the federal courts outweighs any privacy interest of Doe's.  *See IDT Corp. v. eBay*, 709 F.3d 1220, 1224 (8th Cir. 2013).  Accordingly, the motion will otherwise be denied.

## X.  Conclusion

IT IS THEREFORE ORDERED that:

---

[11] The Court notes that, regardless of the outcome on summary judgment, it would have denied Doc. 47 on the merits.  *Lindholm v. BMW of N. America, LLC*, 2016 WL 1643832, at *4 (D.S.D. April 25, 2016) ("Usually, informal discovery requests are not recognized as appropriate discovery requests under the Federal Rules of Civil Procedure sufficient to justify granting a motion to compel.")

- Plaintiff Joan Doe's claims are DISMISSED WITH PREJUDICE.

- Plaintiff's motion (Doc. 42) to retroactively seal will be GRANTED IN PART AND DENIED IN PART.  The Clerk is directed to place Docs. 4, 9-1, 36, and 39 under seal.  Plaintiff may refile Docs. 2, 18, 23, and 29 with her address redacted.  The motion is otherwise denied.

- Plaintiff's Motion to Compel (Doc. 47), Motion for Continuance (Doc. 55), Motion to Waive Jury Trial (Doc. 60), and Motion for Service (Doc. 63) are DENIED AS MOOT.

  IT IS SO ORDERED this 12th day of December, 2023.

/s/ P. K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE